**CENTRAL & SOUTH WEST CORPORA-TION, for itself and as Common Parent of its Subsidiaries, West Texas Utilities Company, for itself and as one of said Subsidiaries, and Central Power & Light Company, Public Service Company of Oklahoma, and South Western Electric Power Company, as subsidiaries of Central & South West Corporation, Plaintiffs,**

v.

**Horace L. BROWN, Defendant.**

**Civ. A. No. 2344.**

United States District Court
D. Delaware.

Dec. 20, 1965.

Alexander L. Nichols, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Isham, Lincoln & Beale, Chicago, Ill., of counsel, for plaintiffs.

John B. Jones, Jr., Acting Asst. Atty. Gen., David A. Wilson, Jr., and Burton G. Lipsky, Attys., Dept. of Justice, Washington, D. C., Alexander Greenfeld, U. S. Atty., Wilmington, Del., for defendant.

STEEL, District Judge.

This is a civil action for refund of income taxes and interest for the year 1954 plus statutory interest thereon paid by one of the plaintiffs, West Texas Utilities Company, (hereinafter "West Texas"), in the amount of $53,902.33. The Court has jurisdiction under 28 U.S.C. §§ 1331(a), 1340, 1346(a) (1), and 1391(b).

The claim arises under section 247 of the I.R.C. of 1954. That section allowed a public utility, in computing its taxable income for 1954, to deduct $14/52\%$ of "the amount of dividends paid during the taxable year on its preferred stock."

In 1954, prior to June 22, West Texas retired, by redemption and exchange, all of its outstanding preferred stock, consisting of 47,370 shares of 6% cumulative preferred stock, without par value, ("Old Preferred stock"), and issued 60,000 shares of 4.40% cumulative preferred stock, par value $100 per share, ("New Preferred stock"). The common stock of West Texas, consisting of 1,400,-000 shares, par value $10 per share, was owned by Central and Southwest Corporation, (hereinafter "Central"), another plaintiff, which was the common parent of an affiliated group of corporations consisting of the other plaintiffs herein. All of the outstanding Old Preferred stock was widely distributed among stockholders who owned no common stock.

Dividends on the Old Preferred stock were cumulative, limited to $6.00 per share per annum, payable quarterly or half yearly at the discretion of the Board, and payable in preference to dividends on the common stock. The Old Preferred had a stated value and a liquidating value of $100 per share. It was redeemable on

thirty days notice at $100 per share, plus $10 premium, plus accrued dividends to the date of redemption. The holders had no voting rights unless dividends were in arrears in an amount exceeding $3.00 per share.

Dividends on the 60,000 shares of New Preferred stock were cumulative from April 1, 1954, limited to $4.40 per share per annum, and payable quarterly on the first days of January, April, July and October in preference to dividends on the common stock. On voluntary liquidation each share was entitled to the then effective redemption price including accrued unpaid dividends in preference to the common stock, and upon involuntary liquidation each share was entitled to the par value thereof ($100) plus accrued dividends, in preference to the common stock. The redemption price per share varied from $107 to $109, depending upon the date of redemption, plus accrued dividends. The holders of the shares had no voting rights unless dividends were in arrears in an amount equal to $4.40 per share.

At all pertinent times West Texas was a "public utility" and both the Old Preferred stock and New Preferred stock constituted "preferred stock" as those terms were used in section 247.

The questions for decision are to what extent certain cash distributions which West Texas made in 1954 in connection with (i) the redemption of the Old Preferred stock, and (ii) the exchange of

the Old Preferred stock for New Preferred stock, constituted "dividends" within the meaning of section 247 of the 1954 Code.[1] This meaning, however, must be determined with reference to the 1939 Code.[2]

On or about April 9, 1954 West Texas mailed to the holders of its Old Preferred stock a prospectus stating that it proposed to offer 60,000 shares of New Preferred stock, that 47,370 shares thereof would be offered to the Old Preferred stockholders in exchange for their Old Preferred stock, and that the remainder, plus any unexchanged shares, would be sold to underwriters for public distribution. The "Exchange Offer" in the Prospectus stated that West Texas would offer to exchange its New Preferred for Old Preferred on a share-for-share basis plus $5.24 per share. The manner in which the $5.24 was arrived at was stated in the "Exchange Offer" as follows:

\* \* \* Shareholders who accept such offer will be entitled to receive in cash, in respect of each share of Old Preferred Stock so exchanged, an amount equal to the difference between (a) $105.65, the initial public offering price per share of the New Preferred Stock, including 65¢ of accrued dividends to the redemption date of the unexchanged shares of Old Preferred Stock, and (b) $110.89, the redemption price per share of the Old Preferred Stock, including 89¢ of ac-

1. The effective dates of the provisions of the 1954 Code, where no other dates are specifically provided, are set forth in section 7851 of the 1954 Code. Under section 7851(a) (1) (A), in the absence of other provisions, the sections found in Chapter 1 of Subtitle A (the principal income tax provisions) are effective with respect to taxable years beginning after December 31, 1953, and ending after August 16, 1954. Thus, there being no other provision, section 247 is applicable for the entire calendar year 1954, since West Texas' taxable year began on January 1, 1954.

2. The provisions relating to the meaning of the term "dividends" when used in Subtitle A of the Internal Revenue Code of

1954 are found in Subchapter C of Chapter 1 of Subtitle A. The effective dates of the provisions of Subchapter C are governed by Sections 391 through 395 of the 1954 Code. These provide, in pertinent part, that the Subchapter C provisions are effective only with respect to transactions occurring on or after June 22, 1954. The Subchapter C provisions of the 1954 Code, therefore, are not effective with respect to the transactions here involved, which occurred in April and May, 1954. Under sections 395(b) and 7851(a) (1) (C) of the 1954 Code, the provisions of the 1939 Code remain applicable and are deemed to be included in the 1954 Code until the effective date of their counterparts in the 1954 Code.

crued dividends to such redemption date (presently expected to be on May 24, 1954). * * *

The Prospectus stated further that West Texas proposed to call for redemption on or about May 24, 1954 all outstanding shares of Old Preferred stock not exchanged for New Preferred stock by 3:00 o'clock P.M. on April 19, 1954.

On or about April 23, 1954, West Texas took the following actions:

It issued and delivered 23,158 shares of New Preferred stock to the holders of the 23,158 shares of Old Preferred stock which were deposited for exchange pursuant to the "Exchange Offer", and paid to such holders the aggregate sum of $121,347.92, being the sum of $5.24 for each share of Old Preferred stock exchanged, as provided in the "Exchange Offer." The sum of $121,347.92 was in payment of premium and accrued dividends on the Old Preferred stock exchanged.

It mailed and published notice for redemption on May 24, 1954, at the redemption price of $110 per share and all unpaid accrued dividends thereon to the redemption date, of the 24,212 shares of Old Preferred stock which were not exchanged pursuant to the "Exchange Offer." It also deposited with The First National Bank of Chicago in trust for the redemption of those shares the amount of $2,684,868.68 or $110.89 per share, the redemption price of the shares on May 24, 1954. The amount of $110.89 was the sum of (i) $100 per share, (ii) the redemption premium of $10 per share, and (iii) accrued dividends from April 1, 1954, to May 24, 1954, of 89¢ per share. The $2,684,868.68 deposited

thus consisted of $2,421,200 of par value ($100 times 24,212 shares), $242,120 of redemption premiums ($10 per share times 24,212 shares), and $21,548.68 of accrued dividends (89¢ per share times 24,212 shares).

It delivered to the underwriters 36,842 shares of New Preferred stock (being 60,000 shares less 23,158 shares exchanged for Old Preferred stock) and received from the underwriters in payment therefor $3,878,316.40 consisting of $3,868,410, equal to $105 per share, and $9,906.40, being accrued dividends from April 1, 1954, to April 23, 1954.

In 1954, prior to the refinancing, West Texas paid a quarterly dividend of $1.50 per share (for the quarter ending March 31, 1954) in the aggregate amount of $71,055 on the Old Preferred stock; and subsequent to the refinancing paid three quarterly dividends of $1.10 per share each (for the quarters ending June 30, September 30 and December 31, 1954) in the aggregate amount of $198,000 on the 60,000 shares of New Preferred stock.

As of December 31, 1954 West Texas had for federal tax purposes post-1913 earnings and profits of $4,680,145.20 available for distribution. The amount of its net taxable income for the year 1954 was $2,273,499.75.

For the year 1954 West Texas prepared its tax return on the accrual basis.

Plaintiffs' claim that the following amounts which West Texas paid out of its earnings and profits accumulated after February 28, 1913 were "dividends" within the meaning of section 247, and hence were deductible in computing its taxable income:

| | |
|---|---|
| $5.24 per share premium and accrued dividends paid on 23,158 shares of Old Preferred exchanged | $121,347.92 [3] |
| $10 per share premium paid on 24,212 shares of Old Preferred redeemed | 242,120.00 |
| $.89 per share accrued dividends paid on 24,212 shares of Old Preferred redeemed | 21,548.68 |
| | $385,016.60 |

---

3. The manner in which this should be allocated between accrued dividends and redemption premiums is in dispute.

No deduction has been allowed by the Commissioner on account of these payments.

## DEDUCTIBILITY OF ACCRUED DIVIDENDS

The last regular dividend payment which West Texas made on its Old Preferred stock for the period ending March 31, 1954 was $1.50 per share; a total of $71,055 was paid on the 47,370 shares outstanding. The Government concedes the deductibility of this amount and has allowed plaintiffs a credit for it.

Plaintiffs assert that between April 1, 1954 and the May 24, 1954 redemption date dividends had accrued in the amount of 89¢ per share on the Old Preferred stock, both redeemed and exchanged. This amounted to $21,548.68 on the 24,212 shares which were redeemed and $20,610.62 on the 23,158 shares which were exchanged, or a total of $42,159.30.

The Government concedes that the accrued and unpaid dividends on the Old Preferred stock which was redeemed qualify for the dividend deduction under section 247 but only for the period April 1, 1954 to April 26, 1954. This amounts to $10,088.33. The Government's argument that the period of the accrual should not extend beyond April 26 is based upon the following facts: On April 23, 1954 West Texas deposited irrevocably in trust with the First National Bank of Chicago $2,684,868.68 for the redemption of the unexchanged shares of Old Preferred stock. Although the notice of redemption stated that the company would redeem and retire the shares on May 24, 1954, it also stated that the stockholders had a "prepayment privilege" under which they would be entitled to receive the full redemption price at any time on or after April 26, 1954 upon surrendering their shares. Since the stockholders could obtain the redemption price as early as April 26, 1954, the Government argues that the dividend deduction should not encompass a period beyond that date.

The charter of West Texas provides:

The corporation * * * shall have the right at any time * * * to redeem * * * the preferred stock * * * by the payment to the holders thereof or upon and by the setting aside for the benefit of such holders, as hereinafter provided, of the sum of $100 with respect to each share together with all unpaid accrued dividends thereon and in addition thereto a premium as follows: * * * for each share of $6.00 cumulative preferred stock a premium of $10.00 * * *.

The charter then provides that notice of redemption shall be mailed not less than thirty days before the redemption date, and that a notice of redemption shall be published for three successive weeks, the first publication to be not less than thirty days before the redemption date. The charter continues:

If notice shall be given as aforesaid and any holder of stock called for redemption shall not present his stock for redemption on or before the redemption date specified in the notice, the corporation shall immediately after such redemption date set apart the funds necessary to effect the redemption of such stock and thereupon such stock shall be deemed cancelled and retired and shall not thereafter have any voting power on any question or be entitled to receive any further dividends. The moneys so set apart for the redemption of any stock called for redemption shall be paid to the proper owners of such stock upon the surrender to the corporation for cancellation of the certificates representing such stock.

The charter makes it clear that the holders of shares which are not surrendered for redemption by the redemption date are entitled to accrued dividends to the redemption date. It is unreasonable to suppose that it was intended that those who surrendered their shares should receive less. The only other interpretation of the charter having even a semblance of plausibility is that the preferred stock surrendered for redemption in advance of the redemption date

is entitled to accrued dividends only to the date of payment. If accepted, this interpretation would require a separate computation of the accrued dividends for each stockholder. The impracticality of doing this, and the confusion which would inevitably follow from different per share amounts being paid to different stockholders, depending upon the date on which they surrendered their stock, militates against any such interpretation. Furthermore, the Government urges no such interpretation.

There is no basis for holding that April 26, 1954 is the dividend cut-off date, as the Government contends, simply because the redemption money was then available to any stockholder who wished to surrender his shares in advance of the redemption date. Under the charter, no stockholder was compelled to surrender his shares before the redemption date, and there is no proof that any stockholder did so.

█ West Texas is entitled to a dividend deduction of 89¢ per share which accrued between April 1 and May 24, 1954 on the 24,212 shares of Old Preferred which were redeemed. This amounts to $21,548.68.

As to the accumulated dividends on the Old Preferred stock which was exchanged, the Government contends that of the $5.24 per share, or a total of $121,347.92, which West Texas paid to the stockholders who made the exchange, 24¢ per share, or a total of $5,557.92, represented accumulated dividends, and that $5.00 per share, or a total of $115,-790.00, represented premiums. On the other hand, plaintiffs argue that 89¢ per share, or a total of $20,610.62, represented accrued dividends and that $4.35 per share, or a total of $100,737.30, represented premiums.

As a matter of logic, there is much to be said for the treatment which West Texas contends for. Nor is the "Exchange Offer" inconsistent with that contention. Obviously, the company intended to treat alike stockholders who redeemed and those who exchanged their shares, in the sense that stockholders in each group were to receive $110.89 per share for their Old Preferred stock. The redeeming stockholders received their $110.89 per share in cash. The exchanging stockholders received theirs in stock valued at $105.65 plus cash in the amount of $5.24. The $110.89, of course, represented the redemption price of $110 per share plus accrued dividends of 89¢ per share. It is, therefore, reasonable to treat 89¢ of the $5.24 which was paid to the exchanging stockholders as representing accrued dividends on the Old Preferred stock which they were giving up. This is the view which Arthur Andersen and Company took in its 1954 audit. Although the Government contends that the treatment accorded to the transaction by West Texas on its own books of account indicates that only 24¢ of the $5.24 was considered to be accrued dividends, an analysis of the journal entries casts considerable doubt upon the validity of this contention.

West Texas is entitled to a dividend deduction of 89¢ per share which accrued between April 1 and May 24, 1954 on the 23,158 shares of Old Preferred which were exchanged. This amounts to $20,610.62.

Plaintiffs also claimed and were allowed a dividend deduction of $3.30 per share from April 1 to December 31, 1954 on the 23,158 shares of New Preferred stock of West Texas which were issued in exchange for the Old Preferred stock. A dividend deduction of 89¢ per share for the period April 1 to May 24, 1954 is, as previously stated, properly allowable as a deduction on the 23,158 shares of Old Preferred stock for which the New Preferred stock was exchanged. The question, therefore, arises whether it is proper to allow a dividend deduction for all or any part of the period April 1 to May 24 on the 23,158 shares of New Preferred stock in question.

Plaintiffs attempt to support the deduction by asserting that distributions were in fact made by West Texas on the New Preferred of $1.10 per share for the period April 1 to June 30, 1954, that these distributions were made out of

"earnings and profits," and that therefore they were dividends as defined by section 316(a) of the 1954 Code.[4]

The problem is not soluble by reference to any direct precedent, for there appears to be none. Missouri Pacific R. R. v. United States, 337 F.2d 637 (Ct.Cl.1964), however, provides a close parallel. It involved the deductibility of "pre-issue" bond interest. The taxpayer claimed that it was entitled to deduct interest paid for the period between January 1, 1955, the effective date of a reorganization plan, and March 1, 1956, the date of the judicial consummation order, on new bonds issued pursuant to a plan of reorganization under section 77 of the Bankruptcy Act. It also claimed the right to take an interest deduction for the same period on its old bonds which were replaced by the new bonds under the plan. Thus there was an overlap of the interest deduction claimed of the old and new bonds, just as in the case at bar there is an overlap of the period for which a dividend deduction on the Old and New Preferred stock is claimed. Despite the fact that the new bonds, by their terms, bore interest from January 1, 1955, the Court refused to permit the deduction. It pointed out that the old and new bonds were not independent obligations existing at the same time, but evidenced the same indebtedness, one being substituted for the other upon final approval of the plan. To have permitted a deduction from January 1, 1955, the Court said, would give the taxpayer a "double deduction."[5]

■ The same reasoning is applicable to the Old and New Preferred stock of West Texas which was exchanged. It follows, therefore, that the dividend deduction on the 23,158 shares of New Preferred stock should be disallowed for the period April 1 to May 24.

The only remaining accrued dividend question which is open pertains to the New Preferred stock which West Texas sold to the underwriters. On April 23, 1954 it delivered to the underwriters 36,842 shares of New Preferred stock (being 60,000 shares less 23,158 shares exchanged for Old Preferred stock) and received from the underwriters in payment $3,878,316.40 consisting of $3,868,-410, or $105 per share, and $9,906.40 representing accrued dividends from April 1, 1954 through April 23, 1954. The underwriters sold these shares to the public at $105 per share plus accrued dividends from April 1, 1954.

The parties are in disagreement as to the treatment to be given the $9,906.40 of the purchase price which the underwriters paid to West Texas. The Government claims that this amount should not be allowed as a dividend deduction even though it was included in the amount distributed for the period April 1 to June 30, 1954 on the New Preferred stock. Plaintiffs take a contrary view and say that so long as the company had post-1913 accumulated earnings or profits sufficient to cover the amounts distributed as dividends—and it did have— all of the disbursements constituted dividends under the clear mandate of section 316(a) of the 1954 Code. Plaintiffs assert that the fact that the parties calculated the price which the underwriters paid with reference to the accrued dividends is immaterial.

■ Of the dividends which West Texas paid on its New Preferred stock, the $9,904.40 was not a dividend burden which West Texas carried. It was borne by the underwriters and West Texas was simply a conduit through which the payment was passed to the stockholders. It

---

4. Being a transaction after June 22, 1954, the provisions of the 1954 Code pertaining to dividends (rather than those of the 1939 Code) are controlling. 1954 Code section 391.

5. This situation is to be distinguished from that which arises when a *new* indebted-

ness (*not* in substitution for an old one) provides for interest from a given date prior to its issuance. In this situation a deduction is allowable for the "pre-issue" interest. Commissioner v. Philadelphia Transp. Co., 174 F.2d 255 (3d Cir.), aff'd per curiam, 338 U.S. 883, 70 S.Ct. 186, 94 L.Ed. 542 (1949).

should, therefore, not be allowed a dividend deduction. This is the conclusion which was arrived at in Kentucky Utilities Co. v. Glenn, 250 F.Supp. 265, decided by the District Court for the Western District of Kentucky at Louisville, on October 15, 1965.

By way of summary, West Texas was entitled to a dividend deduction in 1954 of $286,255.20 calculated as follows:

(1) Dividends paid on 47,370 shares of Old Preferred stock from January 1 to May 24, 1954 — $113,214.30 [6]

(2) Dividends paid on 23,158 shares of New Preferred stock issued in exchange for Old Preferred stock for period May 25 to December 31, 1954. — $ 61,368.70 [7]

(3) Dividends paid from April 23 to December 31, 1954 on 36,842 shares of New Preferred stock sold to the public through underwriters. — $111,672.20 [8]

$286,255.20

———◆———

In its tax return plaintiffs claimed and were allowed by the Government a dividend deduction with reference to the West Texas Old and New Preferred stocks of $269,055.00. This was $17,200.20 less than the dividend deduction of $286,255.20 to which plaintiffs were entitled.

## DEDUCTIBILITY OF PREMIUMS PAID ON REDEMPTION OF OLD PREFERRED STOCK

West Texas paid a premium of $10 per share on the Old Preferred stock which it redeemed, or a total of $242,120 on the 24,212 shares. The payment was made out of post-1913 earnings or profits. Plaintiffs claim, and the Government denies, that this amount qualifies as a dividend deduction under section 247.

The 1954 Code contains no definition of a dividend with specific reference to section 247. Nor does the corresponding section of the 1939 Revenue Code which preceded it.

Plaintiffs argue that section 115(a) of the applicable 1939 Code defines a dividend as "*any* distribution made by a corporation to its shareholders * *. * (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year * * *." [Emphasis added.] Section 115(b) provides that "every distribution is made out of earnings and

---

6. Dividends paid on Old Preferred stock from January 1, to May 24, 1954

|  |  |
|---|---:|
| January 1 to March 31, 1954 – $1.50 per share on 47,370 | 71,055.00 |
| April 1 to May 24, 1954 on 24,212 shares redeemed | 21,548.68 |
| April 1 to May 24, 1954 on 23,158 shares exchanged | 20,610.62 |
|  | $113,214.30 |

7. Dividends paid on New Preferred stock issued in exchange for Old Preferred stock from May 25 to December 31, 1954

|  |  |
|---|---:|
| May 25 to June 30, 1954 – 45¢ per share on 23,158 shares | 10,421.10 |
| July 1 to December 31, 1954 – $2.20 per share on 23,158 shares | 50,947.60 |
|  | $61,368.70 |

8. Dividends on New Preferred stock sold to underwriters
Dividends of $3.30 per share for the period April 1 to December 31, 1954 amount to $121,578.60. However, for the period April 1 to April 23, 1954 the dividends amounted to $9,906.40 and this amount was paid by the underwriters to the taxpayer. The difference between $121,578.60 and $9,906.40 amounts to $111,672.20, the net amount of the dividends paid by the taxpayer for the period April 23 to December 31, 1954.

profits to the extent thereof * * *." The plaintiffs assert that under the plain language of sections 115(a) and 115(b) West Texas was entitled to deduct the premium as a dividend under section 247.

This argument ignores the fact that a redemption of preferred stock is a partial liquidation, section 115(i), and that a broad line of demarcation exists between a distribution made by a going concern to its stockholders in the ordinary course of business which section 115(a) deals with, and a liquidating distribution which is the subject of section 115(c).[8a] Hellmich v. Hellman, 276 U.S. 233, 48 S.Ct. 244, 72 L.Ed. 544 (1928).[8b] This differentiation has been constantly recognized by the Treasury since at least 1936. 1936 Revenue Act, Regulations section 115–1; 1939 Code, Regulations section 39.115(a)–1(a); Cf. 1954 Code, Regulations section 1.316–1(a) (1).[9] This distinction, if adhered to in the instant case, is a complete answer to plaintiffs' argument that section 115(a), standing alone, requires that the redemption premium be accorded dividend status.

Plaintiffs assert, however, that Hellmich v. Hellman, supra, is inapposite because the problem there under consideration was the tax effect of a distribution upon stockholders, whereas the present concern is with the tax effect of a distribution on the corporation. This is of no consequence. The distinction between a dividend as defined in section 115(a) and a distribution in liquidation was held to be controlling in St. Louis Co. v. United States, 237 F.2d 151 (3d Cir. 1956), cert. denied, 352 U.S. 1001, 77 S.Ct. 558, 1 L.Ed.2d 546 (1957) where the issue was the tax impact of a distribution upon a personal holding company which was authorized by section 504(a) of the 1939 Code to deduct a "dividends paid credit" as defined by section 27 in computing its taxable income. Because a distribution in liquidation was involved, the Court rejected the taxpayer's contention that the deductibility of the distribution was governed by section 115(a), and held that it was controlled by section 27(g) pertaining to distributions in liquidation.[10] After citing the *Hellmich* case, the Court emphasized the "established" and "dominating" distinction between an ordinary dividend of a going concern to which section 115(a) was applicable, and a distribution in liquidation to which section 115(a) had no relevance. Id. at 155. While a complete liquidation was involved in the *St. Louis* case, and the instant case involves a partial liquidation, section 115(c) makes no distinction between the two in the context of the present problem.

Nor does the legislative history of section 247 aid plaintiffs. It is true that section 133 of the Revenue Act of 1942 was enacted to put dividends on preferred

**8a.** Section 115(c) provides:
"(c) *Distributions in liquidation.* Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. * * * In the case of amounts distributed * * * in partial liquidation * * * the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits. * * *"

**8b.** The Court was there construing §§ 201 (a) and 201(c) of the Revenue Act of 1924 which were the forerunners of section 115(a) and 115(c) of the 1939 Code.

**9.** All provide that "the term 'dividend' * * * comprises any distribution in the ordinary course of business, even though extraordinary in amount." 1939 Code, Regulations section 39.115(a)–1(C) states that "the term 'dividend' does not include distributions under section 115(c), relating to distributions in liquidation * * *."

**10.** Section 27(g), 1939 Code, provides:
"In the case of amounts distributed in liquidation the part of such distribution which is properly chargeable to the earnings or profits accumulated after February 28, 1913, shall, for the purposes of computing the basic surtax credit under this section, be treated as a taxable dividend paid."

stocks of public utility companies on a parity with corporate bond interest insofar as tax deductibility was concerned,[11] and that a corporation which pays a premium over the issuance price or face value of bonds when it redeems them is permitted to deduct the premium in computing its taxable income. 1939 Code, Regulations § 39.22(a)–17(a); 1954 Code, Regulations § 1.61–12(c) (1); Baltimore Steam Packet Co. v. United States, 180 F.Supp. 347 (Ct.Cl.1960). But it does not follow, as plaintiffs argue, that inasmuch as bond redemption premiums are deductible, Congress intended that preferred stock redemption premiums should also be deductible.

Plaintiffs' argument is based upon a misconception of the reason for permitting bond redemption premiums to be deducted. It is not because these premiums are treated as the equivalent of bond interest. The deduction is not allowed as interest under section 23(b) of the 1939 Code, but as an "ordinary and necessary" expense of doing business under section 23(a) (1) (A).[12] The allowance is understandable. The elimination or reduction of bond interest increases corporate profits, and the redemption premium is an expense incurred to accomplish the result. The elimination or reduction of dividends does not affect corporate profits one way or the other. It is simply a payment to an owner of the business. Conceptually, such a payment is not an "expense"—"ordinary or necessary" or otherwise. There is therefore no rational basis for analogizing a premium paid in redeeming preferred stock to a premium paid in redeeming bonds.

So that plaintiffs can get no comfort from section 115(a) standing alone.

Plaintiffs make the alternative argument that even if there be a basic distinction between "dividends" and "liquidating distributions," for purposes of the present question sections 115(a) and 115(c) are so interrelated that the dividend definition in section 115(a) is nevertheless operative in its application to section 247. This argument is founded upon the third sentence of section 115(c) which reads:

> In the case of amounts distributed * * * in partial liquidation * * the part of such distribution which is *properly chargeable to capital account* shall not be considered a distribution of earnings or profits. [Emphasis added.]

Because this denies earnings or profits status to any distribution which is "properly chargeable to capital account," plaintiffs argue that, by negative inference, it requires that earnings or profit status be accorded to any distribution which is not properly chargeable to the capital account, as is true in the case of the premiums here involved. Since any distribution out of earnings or profits is defined as a dividend under section 115 (a), it follows, plaintiffs argue, that the premium must be deemed to be a dividend and deductible under section 247.

The fallacy in this argument lies in the mistaken meaning which plaintiffs ascribe to the third sentence in section 115(c). This section was not enacted to state the *immediate* effect of a distribution either upon the distributing corporation or the recipient stockholder. It was enacted for the purpose of determining the taxability of a *subsequent* distribution by the corporation. This is made clear by its legislative history.

The sentence in question was originally enacted as part of section 201(c) of the Revenue Act of 1924, and read:

> In the case of amounts distributed in partial liquidation * * * the part of such distribution which is properly chargeable to capital account shall not be considered a dis-

---

11. See *e. g.*, statement of W. Truslow Hyde, Jr. before the Committee on Ways and Means, Hearings on the Revenue Revision of 1942, 77th Cong. 2d Sess., pp. 199–205.

12. See Baltimore Steam Packet Co. v. United States, 180 F.Supp. 347 (Ct.Cl. 1960); Cf. Roberts & Porter, Inc., 37 T.C. 23, 27 (1961), aff'd, 307 F.2d 745 (7th Cir. 1962) (decided under similar provisions of the 1954 Code).

tribution of earnings or profits within the' meaning of subdivision (b) of this section [13] *for the purpose of determining the taxability of subsequent distributions by the corporation.* [Emphasis added.]

After reenactment without change in a number of subsequent Revenue Acts, e. g., 1934 Revenue Act, section 115(c), this sentence was reenacted as part of section 115(c) of the 1936 Revenue Act, and later in the 1939 Code, except that the italicized words and the reference to subdivision (b) in section 201(c) of the 1924 Act were eliminated.[14], [15] Notwithstanding the elimination of the words "for the purpose of determining the taxability of subsequent distributions by the corporation" from 115(c) of the 1936 Revenue Act and the 1939 Code, the Treasury, by its Regulations under both statutes has interpreted the sentence to have the limited purpose originally stated in section 201(c) of the Revenue Act of 1924, that is to determine the taxability of *subsequent* distributions by the corporation. 1936 Revenue Act, Regulations § 3.115–5; 1939 Code, Regulations § 39.115(c)–1(C)'; 1954 Code, Regulations § 1.312–5.[16] The fact that the Treasury's interpretation of section 115(c) has remained constant since 1936 and that in the interim the law has never been changed, is entitled to great weight in evaluating the significance of the 1936 amendment, Paragon Coal Co. v. Commissioner, 380 U.S. 624, 636, 85 S.Ct.

1207, 14 L.Ed.2d 116 (1964), See United States v. Davis, 370 U.S. 65, 71, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962); Ostheimer v. United States, 264 F.2d 789, 793 (3d Cir.), cert. denied, 361 U.S. 818, 80 S.Ct. 61, 4 L.Ed.2d 64 (1959), and is an indication of a legislative intention that the third sentence of 115(c) of the 1939 Code shall have the meaning which the Treasury has ascribed to it.

A consideration of other provisions of the tax law confirms the fact that plaintiffs' reliance upon section 115(c) is misplaced. Section 27 entitled "Corporation Credit for Dividends Paid" was first enacted in 1936 to enable corporations under certain circumstances to deduct a "dividends paid credit" in computing their income taxes. Subsection (a) defined "dividends paid credit" as "the amount of dividends paid during the taxable year." Section 27 was cross-referenced to sections 14(a) (2), 102(c) (2), 335 and 355(a). These sections, in effect, permitted the deduction of the "dividends paid credit" in computing (1) surtax on undistributed profits (section 14 et seq.), (2) surtax on corporations improperly accumulating surplus (section 102 et seq.), (3) undistributed supplement P net income of foreign personal holding companies (section 331 et seq.), and (4) surtax on personal holding companies (351 et seq.). Section 27(f) provided that liquidating distributions should be included in the "dividends paid

---

13. Section 201(b) reads:

"(b) For the purposes of this Act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. Any earnings or profits accumulated, or increase in the value of property accrued, before March 1, 1913, may be distributed exempt from tax, after the earnings and profits accumulated after February 28, 1913, have been distributed, but any such tax-free distribution shall be applied against and reduce the basis of the stock provided in section 204."

14. The removal of reference to subdivision (b) is, for present purposes, immaterial.

15. The Congressional history of the 1936 Act does not discuss the reasons for this change. H.R.Rep.No.2475, 74th Cong., 2d Sess. (1939–1 Cum.Bull. (Part 2) p. 667); S.Rep.No.2156, 74th Cong., 2d Sess. (1939–1) Cum.Bull (Part 2) p. 678.

16. Not until 1954 when the 1939 Code was revised were the Treasury Regulations altered. The change in the law and regulations which occurred in 1954 should be referred to for the purpose of establishing that the meaning of the section of the 1954 Code comparable to 115(c) (third sentence) of the 1939 Code is the same.

credit" in certain circumstances. It stated:

> In the case of amounts distributed in liquidation the part of such distribution which is properly chargeable to the earnings or profits accumulated after February 28, 1913, shall, for the purposes of computing the dividends paid credit under this section, be treated as a taxable dividend paid.[17]

The effect of section 27(f), and the sections to which it was interrelated, was to expressly accord to liquidating distributions of a limited kind the status of dividends for purposes of the "dividends paid credit."

With two unimportant exceptions,[18] in 1936 there were no corporations except those referred to which were authorized to deduct dividends in computing their income taxes. The first time public utilities were permitted to do so was in 1942 when the forerunner of section 247 of the 1954 Code was enacted. 1939 Revenue Code (as amended), section 26(h). Hence, if as plaintiffs argue, the third sentence of section 115(c) were interpreted to authorize the deduction of dividends as defined in section 115(a), there would have been no corporations in 1936 to which these sections could have applied, for section 27(f) had preempted the field.

■ Sections 27(f), 115(a) and the third sentence of 115(c) of the Revenue Act of 1936 were reenacted as sections 27(g), 115(a) and 115(c) of the 1939 Code. Since demonstrably sections 115(a) and 115(c) of the Act of 1936 did not serve to authorize any corporations to deduct dividends paid in computing their income taxes, it is not reasonable to suppose that the same sections when reenacted in 1939 were intended to have that effect.

Lastly, plaintiffs argue that Congress intended for section 115(c) to state the tax impact of a liquidating distribution upon the distributee and not the distributing corporation. Plaintiffs attempt to support this argument by pointing out that the third sentence in section 115(c) of the Code of 1939, was reenacted in the Code of 1954 as section 312(e);[19] that the 1954 Code, in dealing with "distributions by corporations"[20] divided the subject into two subparts: subpart A relating to "effects on recipients," and subpart B pertaining to "effects on corporation;" and that section 312 was placed under subpart B.

■ The answer to this contention is found in what has already been said. The purpose of the third sentence of section 115(c) of the 1939 Code was to make clear that a liquidating distribution which was properly chargeable to the

---

**17.** The phrase *"taxable* dividend paid" finds its explanation in section 27(h) of the 1936 Revenue Act. It provides, in effect, that no "dividends paid credit" shall be allowed with respect to a distribution which is not a *taxable* dividend.

**18.** Section 121 of the Revenue Act of 1936 permitted banks of certain categories to deduct "any dividend * * * paid within such taxable year" in computing their taxable income. The section excluded from deductible dividends "any distribution in liquidation." Section 115(c) (third sentence), therefore, had no application to distributions by banks subject to section 121, except to account for earnings and profits available for later dividend distributions.
Section 262(b) of the Revenue Act of 1936 permitted China Trade Act Corporations to deduct "special dividends" paid to specified persons under specified conditions. Because of the definition of "special dividends" contained in section 262(b), section 115(c) (third sentence) could have no application to distributions by these corporations, except to account for earnings and profits available for future dividend distributions.

**19.** The Senate Finance Committee Report on the 1954 Code, S.Rep.No.1622, 83d Cong., 2d Sess. (3 U.S.Code Cong. & Adm.News, p. 4887 (1954) states:
"Subsection (e) [of section 312] corresponds to the third sentence of section 115(c) of the existing [1939] Code."

**20.** This subject is dealt with in Chapter 1, subchapter C, Part I of subtitle A relating to income taxes.

capital account should not be considered a distribution of earnings or profits insofar as *subsequent* distributions were concerned. There is no reason to suppose that when the sentence in question was reenacted as section 312(e) of the 1954 Code it was intended that it should have any different effect than that which it had ever since 1924. In speaking of a distribution which is "properly chargeable to capital account" the section used language of corporate accountancy. It was, therefore, reasonable that Congress should include the section in the 1954 Code under a subpart entitled "effects on corporation."

▉ Deductions, like exemptions, are privileges and must be narrowly construed. They will be allowed only when granted by clear language. The burden is upon the taxpayer to show that he comes within the terms of the provision granting the privilege. 1 Mertons, Law of Federal Income Taxation ¶3.08, pp. 16–17 (Zimet Revision 1962). Plaintiffs have failed to meet this burden.

The premiums which West Texas paid in redeeming its cumulative preferred stock are not deductible. The only other courts which have considered the problem have come to the same conclusion. Atlantic City Elec. Co. v. United States, 161 F.Supp. 811, (Ct.Cl.) cert. denied, 358 U.S. 834, 79 S.Ct. 56, 3 L.Ed.2d 71 (1958); Idaho Power Co. v. United States, 142 Ct.Cl. 534, 161 F.Supp. 807, cert. denied, 358 U.S. 832, 79 S.Ct. 53, 3 L.Ed.2d 70 (1958); Kentucky Utilities Co. v. Glenn, 250 F.Supp. 265, decided by the District Court, Western District of Kentucky, at Louisville, on October 15, 1965.

DEDUCTIBILITY OF PREMIUMS PAID ON EXCHANGE OF NEW PREFERRED STOCK FOR OLD PREFERRED

▉ The cash premium of $4.35 per share which West Texas paid to holders of Old Preferred stock who exchanged their shares for New Preferred stock was paid out of earnings or profits. Plaintiffs argue that the payment falls squarely within the designation of dividends in section 115(a) of the 1939 Code, and hence the payment is deductible under section 247 of the 1954 Code.

This same contention was made and rejected in Idaho Power Co. v. United States, supra, under circumstances comparable to those at bar. The conclusion of the Court appears to be sound. There is no need to restate its reasoning. Upon the basis of the *Idaho Power* case, the same conclusion was arrived at in Kentucky Utilities Co. v. Glenn, supra.

The premium of $4.25 is not entitled to be deducted as a dividend under section 247.

A judgment will be entered for plaintiffs in an amount to be computed by the parties in accordance with their stipulation.